Receipt #062634

ORIGINAL

ECF

FILED
APR 1 2005
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

EP PRODUCTIONS, INC

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Case No. 05- 425C

## COMPLAINT

COMES NOW, EP Productions, Inc., plaintiff in the above-styled action and by and through counsel files its Complaint against the United States as follows:

JURISDICTION/PARTIES

1.

EP Productions, Inc. ("EP") is a Georgia Corporation with its principal place of business in Fulton County, State of Georgia. It voluntarily submits itself to the jurisdiction and venue of this Court and further, by virtue of the facts hereinafter alleged, is subject to the jurisdiction and venue of this honorable Court. EP was awarded a Contract Number DAMT01-02-C-0035 and its economic interests have been adversely affected by the termination of the Contract by the Military Traffic Management Command ("MTMC"), now the "SDDC". Said Contract was terminated for the convenience of Government pursuant to FAR Part 52.212-4(l). Accordingly, EP Productions, Inc. is a proper party to this action.

2.

Defendant The United States (the "Government") is subject to the jurisdiction and venue of this Court by virtue of its solicitation and award of a certain contract under the name of the procuring governmental agency, the Military Surface Deployment and Distribution Command (formerly Military Traffic Management Command – MTMC – now the SDDC) (herein "MTMC" or "SDDC"). The Contract/Solicitation was terminated for the convenience of the Government pursuant to FAR Part 52.212-4(l).

3.

This action is for damages arising out of the termination for convenience by the Government of Contract Number DAMT01-02-C-00353 (the "Contract"), the same being terminated to the harm of EP Productions, Inc. on February 12, 2003 (in writing February 13, 2003).

4.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1491(a)(1) and 41 U.S.C § 609(a)(1).

5.

EP timely submitted its claim arising out of the termination for convenience, the last part of which was received by the Government on January 8, 2004. The Government issued its final decision on May 27, 2004 and this action has been filed in response thereto for de novo review.

## FACTS

6.

The preceding paragraphs 1 through 5 are incorporated by reference as if stated fully and verbatim herein.

7.

EP had been awarded the Contract to provide event planning and coordination services, etc... for the MTMC/SDDC Annual Symposium. On February 12, 2003, EP received a telephone call from Toye Lattimore, the then Contracting Officer, informing EP that the 2003 Symposium would be cancelled. In response for such a statement in writing, Ms. Lattimore responded that "[t]he Government hereby invokes a partial termination for contract DAMT01-02-C-0035. This serves as official notice that the symposium for calendar year 2003 is cancelled and all related work except for the DVD video, which is Modification P0009." A copy of the e-mail is attached as Exhibit "A" hereto and incorporated by reference.

8.

The following day, Contract Number DAMT01-02-C-0035 was "partially terminated" by a certain "Amendment of Solicitation/Modification of Contract" (the "Amendment/Mod") and the Government directed that "[t]he Contractor shall immediately stop all work . . . and shall immediately cause any and all of its suppliers and subcontractors to cease work." A true and correct copy of this document is attached hereto as Exhibit "B" and incorporated by reference.

9.

The Amendment/Mod also contained the following language: "To ensure a smooth transition of all cancellations, the Government requests the Contractor to carry out the following tasks in regards to the termination. All reasonable costs associated with the tasks listed below will be considered termination costs." The eight (8) items required of EP were:

1. Develop email to send to all registered attendees. Coordinate with COR;
2. Dispatch 1,200 email notifications;
3. Develop 1,200 cancellation numbers for hotel;
4. Develop 1,200 cancellation numbers for symposium;
5. Contact by telephone those unable to reach via email (wrong email address provided);
6. Develop announcement for Symposium web page;
7. Remove all links on the Symposium web page, especially registration links;
8. Develop an auto-reply for the Symposium email system.

10.

EP undertook these items and completed the same in accordance with the Government's instructions.

11.

In early March, EP forwarded several invoices to the Government for payment totaling $165,000.00. However, the Government refused to pay the

amount claiming that it constituted a "progress" payment that was not allowed under the contract. Specifically, by letter dated March 21, 2003, Francis A. Giordano, the Director, MTMC Contracting Center, informed Ms. Porter that "since there are no deliverables that have been accepted under this contract, it is inappropriate to invoice at this time. However, you may recover all allowable costs that you have incurred through the termination for convenience clause contained in your contract."

12.

By April 2003, a new "Terminating Contracting Officer" was assigned, namely Jackie Robinson-Burnette ("JRB"). However, little, if any correspondence was exchanged between the Government and EP over the next six (6) months, as the Government appeared to be busy with other things.

13.

By July 2003, the Government's silence became quite disheartening to EP. She inquired, only to learn that she was not on slate to be invited to the IPT for the upcoming contract. This is strange, given that most incumbents are invited to the IPT for the upcoming contract to share ideas to make the contract better. Ms. Porter, on behalf of EP, ultimately attended the IPT and went to Washington, DC specifically to meet with JRB for an informal settlement discussion. Immediately thereafter, due to a problem pregnancy, Ms. Porter was placed on bed rest.

14.

In September 2003, the Government, through JRB, with complete knowledge of Ms. Porter's condition, began pushing the termination for convenience issue, threatening and creating deadlines that were not part of FAR.

15.

By October 2003, EP succumbed to the Government's request and set up a series of deadlines for producing its termination for convenience documentation. As part of the accelerated deadline schedule (normally, a contractor is provided a year to submit its termination for convenience), EP agreed to provide the documentation in phases. Upon the contracting officer's approval of the submission, the next submission would be made.

16.

Contrary to the agreement, JRB did not even review the submissions as they came to her and without the agreed upon feedback of the contracting officer, EP had submitted its entire termination for convenience package prior to the deadline to do so.

17.

The Contracting Officer (JRB) indicated that she wanted the information in a very simple format, rather than broken down and categorized as set forth in the FAR. Further, to confirm this fact, EP and its counsel went to Washington, DC to meet with JRB. Again, the information was to be submitted in an informal manner. This is exactly what EP did.

18.

Part One of the Termination for Convenience Settlement was submitted on November 3, 2003 in the face amount of $183,719.80, a true and correct copy of which is attached as Exhibit "C" and incorporated herein by reference.

19.

Part One included several "TABS" delineated by CLIN. Each TAB included the claim for reimbursement amount, the associated CLIN and a narrative regarding the same. TAB 1 was for "administrative expenses" totaling $55,000.00. TAB 2 was for "Reports" totaling $3,500.00. TAB 3 was for "Tote bags/Program Book Materials" totaling $13,219.80. TAB 4 was for "Registration" totaling $107,500.00. TAB 5 was for "Specialized Meeting Management" totaling $4,500.00.

21.

The Government, through its contracting officer, JRB, provided no negative feedback from this submission and on December 3, 2003, Part Two of the Termination for Convenience Settlement was submitted by EP.

22.

The total of the Part 2 submission was $150,923.75, a true and correct copy of which is attached hereto as Exhibit "D" and incorporated herein by reference.

23.

TAB 1 of Part 2 covered "Equipment Costs" totaling $150,923.75 and like the other referenced TABS, included the CLIN reference, amount and narrative explanation of the charges.

24.

As before, Part 2 was submitted with explicit instructions regarding any changes necessary as to the format, etc.... Further, it contained the following language: ". . . prior to our submission of the final part (Part Three) . . . notify us of any difficulties or discrepancies that you have with Part One and/or Part Two. That way any problems or challenges may be cleared up before the final submission portion is received." Once again, as with Part One, there was no objection as to the form or content of the submission.

25.

Part Three was submitted on January 8, 2004 and contained a claims totaling $80,054.00. A true and correct copy of the same is attached hereto as Exhibit "E" and incorporated herein by reference.

26.

Part Three included a number of TABS, each again referencing the corresponding CLIN, setting forth a claim amount, as well as a short narrative/explanation.

27.

Specifically, Part Three, TAB One included a claim for "Name Badges" totaling $5,821; TAB Two was a $1,000.00 claim for the "Photographer"; TAB

Three encompassed the "Motivational Speaker" and totaled $7,500.00; TAB Four was a claim of $6,625.00 for "Rosters"; TAB Five included a claim of $12,250.00 for "Room Monitors"; TAB Six encompassed a claim for "Meeting Materials" totaling $39,358.50; and TAB Seven was for the eight (8) items requested by the Government to cancel the Symposium.

28.

With the final submission for the Termination for Convenience package having been sent to JRB, EP concentrated its efforts on the 2004 Symposium, which was just months away.

29.

At the same time, EP was participating in the competition for the award of the 2005 Symposium Contract.

30.

In addition, EP learned that it was the subject of a CID Investigation instituted by JRB. At that point, it became clear that JRB, individually and in her capacity as the Contracting Officer, wanted someone other than EP to be awarded the Contract. The prejudice was clear and had begun earlier when the prior contracting officer, Toye Lattimore, was revealed by EP to be in error on a number of contract items.

31.

For example, even at the IPT prior to the Solicitation of the Contract for 2005, EP was intentionally not invited. However, EP showed up and inquired as to the inclusion of complimentary rooms and/or meeting space (collectively,

"Comps") as part of its bid/proposal for the Contract. The inquiry was directed to JRB, who referred the question to Jeanie Bell Winslow. Ms. Winslow stated that Comps would not be allowed under the Contract – that they had never been permitted.

32.

Comps, generally speaking, are the commercial norm. That is, frequently, with respect to conventions and meetings, hotels provide Comps on a 1 to 40 or 50 basis such that for every forty or fifty rooms booked, a room, or the value thereof, is provided free of charge.

33.

Despite the fact that Comps are an industry norm, Ms. Winslow stated that Comps had never been allowed in prior contracts for the MTMC/SDDC Symposium and further, because the government cannot take anything for free, Comps would not be considered for the Contract.

34.

Accordingly, EP did not include Comps in its bid/proposal. Yet, once bids were submitted, other bidders for the 2005 contract included Comps and the Government permitted it.

35.

Other evidence of bias includes the unilateral change of evaluation panel scores relative to the 2005 Contract by JRB. Specifically, EP's panel rating scores were reduced from two "excellent" and two "very goods" to an overall "good". This is a logical malady and simply not possible absent the bias of JRB.

36.

The bias continued in the termination for convenience settlement when JRB, having created a set of informal rules for resolution, refused to pay certain items because they were not presented in a formal manner.

37.

In conjunction with the 2005 Symposium Contract solicitation, JRB amended the Contract to avoid awarding the contract to EP, allowing those with unacceptable facilities to be allowed to continue in the competitive process.

38.

It was later uncovered in conjunction with a protest, that JRB caused the contract to be awarded to an entity that did not provide a mandatory contract item. However, she indicated through counsel that the offeror included the same.

39.

Later, after issuing the final opinion on the termination for convenience settlement, JRB attempted to make a request for $25,070.00 by EP as part of the registration fee reimbursement a crime with the CID. She declined to pay the agreed upon contract amount and referred the matter to CID.

40.

The bias of JRB extended not only to solicitation, but the existing contract that EP was in the process of performing and the settlement of the termination for convenience.

## GENERAL COUNT I

## DAMAGES FROM FAILURE TO COMPLY WITH FAR 52.212-4

41.

The preceding paragraphs 1 through 40 of plaintiff's complaint are incorporated by reference as if stated fully and verbatim herein.

42.

FAR 52.212-4 provides in pertinent part that "the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination...."

43.

In the event of termination of the Contract, the Government was required to pay EP for work performed prior to the termination, plus reasonable charges resulting from the termination.

44.

The Government terminated the Contract, but failed to pay work EP for work performed prior to the termination.

45.

The Government terminated the Contract, but failed to pay EP for reasonable charges resulting from the termination.

46.

The above-described failure to pay on the part of the Government constitutes a violation of FAR 52.212-4.

47.

As a direct consequence of the Government's failure to comply with FAR 52.212-4, EP suffered damages in the form of reimbursement costs as set forth more particularly below, as well as the reasonable charges resulting from the termination.

**COUNT II**

**BREACH OF AGREEMENT ON TERMINATION**

48.

The preceding paragraphs 1 through 47 are incorporated by reference as if stated fully and verbatim herein.

ADMINISTRATIVE COSTS

49.

As to the "Administrative Costs" claim as part of the termination of convenience, EP Claimed $55,000.00, or 100% of the contract line item ("CLIN") 006.

50.

However, the claim was only partially accepted in the amount of $50,416.74, or 91.6% of the work. The basis for the denial of a portion of CLIN 006 was that JRB used the interim payment schedule. This was a mistake on the

part of JRB as a result of both her lack of understanding of the contract, as well as her election to follow her own termination for convenience guidelines.

51.

EP should have received the entire amount claimed under "Administrative Costs." These costs include overhead expenses and the like. In lieu of placing it under the category of "termination costs," EP simply claimed the overhead expense under the normal category of "Administrative Costs." That is, no such claim was made under the "cost of termination" because of the direction given by the contracting officer, JRB, who led EP to believe that a "simple, informal approach" was the best way to submit the termination package.

52.

The failure to pay this obvious cost of termination constitutes a breach, the damages from which the Government is liable to EP.

LEASED EQUIPMENT – 58 Different CLINS

53.

EP's claim for equipment totaling $150,923.75 was denied in its entirety, though it was a valid submission and represented a compromise amount of what was actually owed to the underlying vendors.

54.

Specifically, the equipment contract called for full payment in the event of termination within thirty (30) days of departure. This is an industry norm.

55.

Either cleverly, or through a complete lack of understanding of the Contract by JRB, she, as the Contracting Officer, stated that she performed her own "market research" and determined that "full service companies generally charge minimal cancellation fees for events cancelled 30 or more days in advance, **as is the case.**"

56.

However, that is not the case. The production company was located in Jacksonville, Florida and had to truck the equipment to Denver. Further, the production company is on hand a number of days in advance and as such, the departure date was well inside of 30 days at the time of cancellation.

57.

As such, contrary to JRB's assertions, the industry norm based upon any reasonable research would clearly demonstrate that "minimal cancellation fees" would not apply in this case, as the time was inside 30 days, not outside.

58.

As to the charges, EP negotiated a discount with the production company by getting them to reduce the amount owed to $150,923.27. The company has made a claim for the amount due and is now threatening to enforce the full value of the contract, plus attorneys' fees and costs associated with the collection of the account.

59.

The claim amount is reasonable and the denial of payment improper.

60.

The claimed amount is required to be paid by the Government as part of the termination for convenience.

61.

The Government is liable to EP for $150,923.75 for equipment charges by reason of the termination for convenience.

62.

In addition, further demonstrating the bias of JRB and the contracting office, there is an allegation that EP and/or Ms. Porter had a financial interest in the production company based upon a typographical error in the certification citing a "subtle but very significant difference" in the spelling.

63.

Neither EP, nor Ms. Porter has a financial interest in the production company.

ROOM MONITORS

64.

Room monitors are required under the Contract. These people are not simply warm bodies. They must know how to work the equipment and be pleasant, welcoming individuals.

65.

EP arranged "room monitors" with substantial experience with the Symposium. These people generally work in the convention and meeting

planning business and are therefore, professionals, holding regular jobs in the industry with the exception of the two-week period of the Symposium.

66.

EP purchased non-refundable airline tickets and had each of these people take their vacations during the Symposium. They counted on the money to be derived from this work, sacrificing their vacations as well.

67.

JRB denied the entire claim with the exception of $942.00 for the airline tickets.

68.

The claim amount was properly claimed under the termination for convenience and the Government should have paid the same.

69.

The Government's failure to do so is contrary to law in that the Government is required to pay these charges as a consequence of the termination for convenience.

<u>CANCEL OF SYMPOSIUM SERVICES</u>

70.

EP claimed $7,500.00 for certain tasks associated with notifying Symposium registrants that the Symposium was cancelled.

71.

JRB admitted that the Government had an obligation to pay EP for this effort. However, JRB opined that she did not have enough information to determine the reasonableness of the claim amount and decided to pay nothing.

72.

Again, JRB changed the rules inasmuch as she indicated she only wanted an informal explanation of work done and at all stages of the process, indicated she had received enough information to make her decision.

73.

The charge for the task directed by the Government was reasonable and should be paid as part of the termination for convenience settlement.

74.

The failure of the Government to do so is the result of JRB's failure to apply her own rules and guidelines she established with regard to the termination for convenience.

75.

The failure of the Government to pay this amount constitutes a breach of its implied agreement to deal fairly with a contractor in conjunction with a termination for convenience settlement.

AIRLINE TICKETS FOR SETTLEMENT MEETING

76.

EP claimed $768.40 for airline tickets from the February 2, 2004 final settlement proposal meeting. The Government, through JRB, denied the claim in full based upon the fact the cost was not supported.

77.

However, in the settlement package, a copy of the e-tickets was provided to JRB listing the name of the passenger, the date and times of the flight, flight number and the cost of the tickets.

78.

The denial of the charges for the airline tickets is simply further evidence of bad faith on the part of JRB and contracting.

79.

Simply put, the airline ticket charge was a reasonable charge incurred as a direct consequence of the termination for convenience and the Government is liable to EP for the same.

PREPARATION OF TERMINATION FOR CONVENIENCE CLAIM

80.

EP, by and through its president, Elizabeth Porter, spent 186 hours preparing the termination for convenience claim to submit to JRB and the Government.

81.

The services were billed at a rate of $75.00 per hour, said rate being reasonable under the circumstances.

82.

JRB, as the Contracting Officer, denied the claim in full stating that she did not receive appropriate documentation. Again, JRB changed her own rules, as she did not request any further information from EP that would lead EP to believe that it need to supplement its claim. Rather, consistent with prior discussions, the charges were submitted in a "simple, informal manner."

83.

The Government is liable to EP for $13,950.00 incurred in conjunction with the preparation of the termination for convenience package.

84.

This amount is reasonable under the circumstances and certainly an allowable claim under the termination for convenience settlement inasmuch as it was reasonably related and occurred as a direct consequence of the Government's termination for convenience.

**COUNT III**

**FAILURE TO PAY REGISTRATION MODIFICATION**

85.

The preceding paragraphs 1 through 84 are incorporated by reference as if stated fully and verbatim herein.

86.

On July 27, 2004, EP submitted a request for payment for the balance of $25,070.00 for registration fees for the 2004 Symposium.

87.

JRB, contrary to the manner of presentation, treated this as a claim and ultimately, due to existing bias and contrary to law, refused to pay the same.

88.

In addition, as usually was the case when JRB became threatened, she reported the matter to the CID – all again in an effort to intimidate EP.

89.

As to the request for payment, the contract for the 2004 Symposium was modified to provide a guarantee of 1600 registrants and therefore, registration fees of 1600 persons.

90.

At the time of the initial discussions, the registration fee of 1600 persons was considered to be the base value of food and beverage charges to the host facility – a charge for which EP would be liable.

91.

As such, the parties modified the Contract to provide a registration of 1600 persons a guarantee under the Contract.

92.

After completing the Symposium in 2004, EP submitted a request for the balance of monies due under the Contract.

93.

JRB refused, treating the issue as a claim that required documentation. Thereafter, JRB learned that the food and beverage guarantee was less than the registration fee multiplied by 1600 registrants.

94.

Due to JRB's complete misunderstanding of the contract, she attempted to twist the request for payment into a claim and referred the matter to CID.

95.

Had JRB understood that there were discounts such that profits of EP that could not be paid in cash were simply deducted from the guarantee minimums, she would have paid the claim without question.

96.

However, JRB's unfamiliarity with the industry, complete lack of knowledge of the contract and relentless bias toward EP made her quick to again call on the CID.

97.

The Government's failure, through JRB, to honor the reasonable request for payment resulted in a loss to EP in the amount of $25,070.00.

98.

The request for payment was proper and unjustifiably denied by JRB.

99.

The Government is liable to EP for payment of $25,070.00.

## COUNT IV

## ATTORNEYS' FEES / COSTS

100.

The preceding paragraphs 1 through 99 are incorporated by reference as if stated fully and verbatim herein.

101.

As a direct and proximate result of the Government's unjustifiable denial of the termination for convenience claims, EP incurred and continues to incur substantial attorneys' fees and costs.

102.

The Government is liable to EP for all attorneys' fees and costs incurred in connection with the prosecution of its claims under the termination for convenience.

WHEREFORE, EP Productions, Inc. respectfully prays as follows:

a) that Summons issue and the Government be served with this Complaint;

b) that it have and receive judgment against the Government;

c) that EP be awarded $4,583.26 for reimbursement of "administrative costs" in conjunction with the termination for convenience;

d) that EP be awarded $150,923.75 for reimbursement of "Leased Equipment" charges in conjunction with the termination for convenience;

e) that EP be reimbursed for all costs associated with the litigation between the production company and EP arising out of its defense of the production company's claim for failure to pay;

f) that EP be awarded $11,558.00 for reimbursement of "Room Monitors" that were denied payment of 100% of their fee for the Symposium;

g) that EP be awarded $7,500.00 for reimbursement of "Cancel Symposium Services";

h) that EP be awarded $768.40 for reimbursement of airline tickets for settlement meeting;

i) that EP be awarded $13,950.00 for costs incurred in preparing the termination for convenience claim;

j) that EP be awarded and paid monies owed it by virtue of the modification regarding registration fees in the amount of $25,070.00;

k) that all costs of this action be taxed against the Government;

l) that EP be awarded all costs and attorneys' fees incurred in the prosecution of this termination for convenience complaint as set forth by appropriate, timely amendment to this Complaint or otherwise proven at trial; and

m) for such other and further relief as this Court may deem just and appropriate under the circumstances.

Respectfully submitted, this 29th day of March, 2005.

**THE FRICKS FIRM, P.C.**

By ROBERT ABNEY FRICKS
Georgia Bar No. 277135

Attorneys for EP Productions, Inc.

239-B Smithville Church Road
Warner Robins, Georgia 31088
Telephone (478) 953-2312
Facsimile (478) 971-3871
rob@fricksfirm.com